## HYATT *v.* PEOPLE &c. *ex rel.* CORKRAN.

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 492.  Argued January 7, 1903.—Decided February 23, 1903.

A person, for whose delivery a demand has been made by executive authority of one State upon the executive authority of another State under clause 2 of section 2 of Article IV of the Constitution, and who shows conclusively, and upon conceded facts, that he was not within the demanding State at the time stated in the indictment, nor at any time when the acts were, if ever, committed, is not a fugitive from justice within the meaning of Rev. Stat. sec. 5278, and the Federal statute upon the subject of interstate extradition and rendition.

If the governor of the State upon whom the demand is made issues a warrant for the apprehension and delivery of such a person, the warrant is but *prima facie* sufficient to hold the accused, and it is open to him, on *habeas corpus* proceedings, to show that the charge upon which his delivery is demanded assumes that he was absent from the demanding State at the time the crime alleged was, if ever, committed.

THIS proceeding by *habeas corpus* was commenced by the relator, defendant in error, to obtain his discharge from imprisonment by the plaintiff in error, the chief of police in the city of Albany, State of New York, who held the relator by means of a warrant issued in extradition proceedings by the governor of New York.  The justice of the Supreme Court of New York, to whom the petition for the writ was addressed, and also upon appeal, the Appellate Division of the Supreme Court of New York, refused to grant the relator's discharge, but the Court of Appeals reversed their orders and discharged him. 172 N. Y. 176.  A writ of error has been taken from this court to review the latter judgment.

The relator stated in his petition for the writ that he was arrested and detained by virtue of a warrant of the governor of New York, granted on a requisition from the governor of Tennessee, reciting that relator had been indicted in that State for the crime of grand larceny and false pretenses, and that he was a fugitive from the justice of that State; that the warrant under which he was held showed that the crimes with which he was charged were committed in Tennessee, and the relator stated that nowhere did it appear in the papers that he was personally present within the State of Tennessee at the time the alleged crimes were stated to have been committed; that the governor had no jurisdiction to issue his warrant in that it did not appear before him that the relator was a fugitive from the justice of the State of Tennessee, or had fled therefrom; that it did not appear that there was any evidence that relator was personally or continuously present in Tennessee when the crimes were alleged to have been committed; that it appeared on the face of the indictments accompanying the requisition that no crime under the laws of Tennessee was charged or had been committed. Upon this petition the writ was issued and served.

The return of the defendant in error, the chief of police, was to the effect that the relator was held by virtue of a warrant of the governor of New York, and a copy of it was annexed.

The governor's warrant reads as follows:

" STATE OF NEW YORK,
    " *Executive Chamber.*

" The governor of the State of New York to the chief of police, Albany, N. Y., and the sheriffs, undersheriffs and other officers of and in the several cities and counties of this State authorized by subdivision 1 of section 827 of the Code of Criminal Procedure to execute this warrant:

" It having been represented to me by the governor of the State of Tennessee that Charles E. Corkran stands charged in that State with having committed therein, in the county of Davidson, the crimes of larceny and false pretenses, which the said governor certifies to be crimes, under the laws of the said State, and that the said Charles E. Corkran has fled therefrom

and taken refuge in the State of New York ; and the said governor of the State of Tennessee having, pursuant to the Constitution and laws of the United States, demanded of me that I cause the said Charles E. Corkran to be arrested and delivered to Vernon Sharpe, who is duly authorized to receive him into his custody and convey him back to the said State of Tennessee ; which said demand is accompanied by copies of indictment and other documents duly certified by the said governor of the State of Tennessee to be authentic and duly authenticated and charging the said Charles E. Corkran with having committed the said crimes and fled from the said State and taken refuge in the State of New York ;

" You are hereby required to arrest and secure the said Charles E. Corkran wherever he may be found within this State and thereafter and after compliance with the requirements of section 827 of the Code of Criminal Procedure to deliver him into the custody of the said Vernon Sharpe, to be taken back to the said State from which he fled, pursuant to the said requisition ; and also to return this warrant and make return to the executive chamber within thirty days from the date hereof of all your proceedings had thereunder, and of the facts and circumstances relating thereto.

" Given under my seal and the privy seal of the State, at the capitol in the city of Albany, this 13th day of March, in the year of our Lord one thousand nine hundred and two.

    " [L. S.]                   B. B. ODELL, JR.

" By the Governor : JAMES G. GRAHAM,
          " *Secretary to the Governor.*"

No other paper was returned by the chief of police bearing upon his right to detain the relator. Upon the filing of the return the relator traversed it in an affidavit, in which he denied that he had committed either the crime of larceny or false pretenses, or any other crime, in the State of Tennessee. He denied that he was within the State of Tennessee at the times mentioned in the indictment upon which the requisition of the governor was issued ; he alleged that he had read the indictments before the governor of the State of New York, upon which

the warrant of arrest was issued, and that they charged him with the commission of the crime of larceny and false pretenses on the 20th and 30th days of April, the 8th day of May and the 17th and the 24th days of June, 1901. The relator in his affidavit also asserted that he was not in the State of Tennessee at any time in the months of March, April, May or June, 1901, or at any time for more than a year prior to the month of March, 1901, and he denied that he had fled from the State of Tennessee or that he was a fugitive from the justice of that State. He further therein stated that he had heard read the papers accompanying the requisition of the governor of Tennessee to the governor of New York, and that those papers did not contain any evidence or proof that he had been in the State of Tennessee at any stated time since the 26th and 27th days of May, 1899, and they contained no evidence or proof that he was in the State of Tennessee on any day in any of the months set forth in the indictments when the crime or crimes were alleged to have been committed.

Upon the hearing the following paper signed by the respective attorneys for the parties was filed:

"It is conceded that the relator was not within the State of Tennessee between the first day of May, 1899, and the first day of July, 1901. It is also conceded that the relator was in the State of Tennessee on the 2d day of July, 1901."

There is also another stipulation in the record, signed by the attorneys, and reading as follows:

"The following additional facts are hereby conceded, and the same shall be incorporated in the appeal record herein, as a part thereof, and shall constitute a part of the record upon which the Appellate Division may hear and determine the appeal herein; i. e.,—

"It is hereby stipulated by and between the parties to the above entitled special proceeding that three indictments were attached to the requisition papers sent by the governor of the State of Tennessee to the governor of the State of New York for the extradition of Charles E. Corkran; that each of the said indictments was found on the 26th day of February, 1902, and that the alleged crimes were charged in said indictments to

have been committed on the 1st day of May, 1901, on the 8th day of May, 1901, and on the 24th day of June, 1901, respectively."

Upon the hearing before the judge on March 17, 1902, the relator was sworn without objection, and testified that he had been living in the State of New York for the past fourteen months; that his residence when at home was in Lutherville, Maryland; that he was in the city of Nashville, in the State of Tennessee, on July 2, 1901, and (under objection as immaterial) had gone there on business connected with a lumber company in which he was a heavy stockholder; that he arrived in the city on July 2, in the morning, and left about half-past seven in the evening of the same day, and while there he notified the Union Bank and Trust Company (the subsequent prosecutor herein) that the resignation of the president of the lumber company had been demanded and would probably be accepted that day. That after such notification, and on the same day, the resignation was obtained, and the Union Bank and Trust Company was notified thereof by the relator before leaving the city on the evening of that day; that he passed through the city of Nashville on the 16th or 17th of July thereafter on his way to Chattanooga, but did not stop at Nashville at that time, and had not been in the State of Tennessee since the 16th day of July, 1901, at the time he went to Chattanooga; that he had never lived in the State of Tennessee, and had not been in that State between the 26th or 27th of May, 1899, and the 2d day July, 1901.

Upon this state of facts the judge, before whom the hearing was had, dismissed the writ and remanded the relator to the custody of the defendant Hyatt, as chief of police. This order was affirmed without any opinion by the Appellate Division of the Supreme Court, 72 App. Div. 629, but, as stated, it was reversed by the Court of Appeals, 172 N. Y. 176, and the relator discharged.

*Mr. Robert G. Sherer* and *Mr. J. Murray Downs* for plaintiff in error.

I. The requisition papers are sufficient. There is no claim here that they are defective in any respect; the warrant of the gov-

ernor is conclusive as to every fact stated in this case, because there is no denial of any of the facts stated in it. *Ex parte Dawson*, 83 Fed. Rep. 307–308; *People* v. *Donohue*, 84 N. Y. 438. There is no denial either in the petition or in the testimony, that the defendant is not guilty of the crime as charged, or that he was not regularly and properly indicted, or that the requisition papers forwarded by the governor of the State of Tennessee to the governor of the State of New York were not proper and sufficient in every particular. The sole defence is based upon this alleged claim, that, as there was no proof that the defendant was in the State of Tennessee at the times the crimes were committed, and that, as the proof was that he was without the State of Tennessee at the times charged in the indictments, he cannot be sent back for trial and punishment. Every material fact stated in the warrant for extradition is admitted except this one. Hence there can be no discussion here as to the guilt or innocence of defendant, nor of the sufficiency of the indictments and requisition papers. The whole issue is narrowed down to this one question, and for the reasons submitted herein it is immaterial where he was when the crime was committed.

II. The Constitution and laws of Congress provide for interstate rendition of fugitives, even in cases where the party charged was not actually present in the demanding State at the time the crime was committed. The Const. of the U. S. art. 4, sec. 2, subd. 2; Rev. Stat. U. S. § 5278, being laws of Congress, 1793, chap. 7.

It appears in Madison's notes of the convention debates (Elliot's Debates [Lippincott edition, 1881], vol. 5, pages 381, 487), that when this provision of the Constitution came before the convention, the following proceedings were had, on the 6th day of August, 1787 : " Committee on detail rendered a report which contained the following clause :

" ' Article XV. Any person charged with treason, felony, or high misdemeanor in any State, who shall flee from justice and shall be found in any other State, shall, on demand of the executive power of the State from which he fled, be delivered up and removed to the State having jurisdiction of the offence.' "

On the 28th day of August, 1787, the convention took up for consideration article XV, and the following proceedings were had :

" Article XV being thus taken up, the words 'high misdemeanor' were struck out and the words 'other crime' inserted in order to comprehend all proper cases, it being doubtful whether 'high misdemeanor' had not a technical meaning too limited."

Thus, at the outset and in the convention it was the evident design of the framers of the Constitution to make this provision broad enough to include every possible crime committed within the borders of the United States, and that no State should be an asylum for fugitives committing crimes in other States.

The act of 1793 was passed by virtue of the power thus conferred by the Constitution, quoted as section 5278 of the Revised Statutes, and that act was entitled " An act respecting fugitives from justice, and persons escaping from the service of their masters."

III. The decision of the Court of Appeals was based upon the doctrine that a person was not a fugitive from justice and should not be surrendered upon demand, unless he was physically present in the demanding State at the exact time the crime was committed.   The court followed the decisions of certain other courts and text writers, referred to in the opinion of Judge Cullen.   Those decisions limit the constitutional provision to the smallest possible effect.   As, if a man leaves New York city and crosses by ferry to Jersey City and while there steals the smallest trifle and then returns to New York city, he is a fugitive from justice and shall be surrendered on demand.   If the same man, instead of using the ferry, uses the telephone and by fraud steals any amount of property from a resident of Jersey City, he is not a fugitive from justice and cannot be surrendered to New Jersey for trial and punishment.

These examples might be multiplied, since murder, assault, arson, larceny, forgery, perjury and any crime not requiring direct personal contact may be committed by use of the mails, express, telegraph, telephone or innocent messenger, or by one standing near the boundary line, in another State, although the

perpetrator never crosses the line into the State wherein the crime is consummated or committed.

If the decision is correct, then the insufficiency of the Constitution must be confessed, in this instance, and amendment resorted to.

The decision of the court below and the argument of the defendant in error is based upon a narrow construction of the preposition "from" as used in the Constitution, but see *Streep* v. *United States,* 160 U. S. 128, as to what a fugitive from justice is. It is immaterial whether the crime has been detected or not, or what the secret intent of the culprit may be; he becomes a fugitive from justice when he avoids the demands of justice. And he flees "from" the justice of the State when he avoids the justice of the State. *Roberts* v. *Reilly,* 116 U. S. 80; *In re Cook,* 49 Fed. Rep. 833; 146 U. S. 183; *Regina* v. *Jacobia,* 46 Law Times, New Series, 595.

IV. Reason for a broad construction. In *Kentucky* v. *Dennison,* 24 How. 66, a broad and comprehensive construction following the intent and purpose of the Constitution was declared; and the policy of surrendering all fugitives from justice, no matter what might be the character of the crime, nor where nor how it was committed, was indicated.

It was one of the necessities of the occasion that the Constitution should be drafted in general language. "The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes of Providence." *Martin* v. *Hunter,* 1 Wheaton, 326.

V. No right of asylum. It has also been the policy of the United States Supreme Court to adopt such a construction as would really establish justice and insure domestic tranquillity, provide for common defence and promote the general welfare. The uniform tendency of the decisions has been to place the doctrine of interstate rendition on the broadest possible basis. In the case of foreign extradition the courts have followed the treaties in the interest of peace and national honor. They have construed those treaties strictly because the treaty conditions required it, because the nation was bound in honor to

observe the terms of the treaties; but wherever an attempt has been made to limit the terms of the constitutional provision, with reference to interstate rendition, the court has steadily set its face against a strict construction. *Mahon* v. *Justice*, 127 U. S. 715; *Lascelles* v. *Georgia*, 148 U. S. 542; *Ex parte Reggel*, 114 U. S. 642.

"If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power, it is a well-settled rule that the objects for which it was given, especially when those objects are expressed in the instrument itself, should have great influence in the construction." *Gibbons* v. *Ogden*, 9 Wheaton, 188.

VI. The constitutional provision should not be weakened and made only half effective by this narrow construction of the phrase "from which." The decision of the court below is a long step backwards, and is an adoption of the policy of strict construction. It is adopting a rule of construction which, if followed as to all the other provisions of the Constitution, would have weakened that charter to the point of uselessness.

VII. It is not the policy of the law to screen criminals from the legal consequences of their crimes. Courts should not, by strained construction, establish asylums for fugitive criminals. If the laws of a State have been violated and crime committed, the wrong-doer should be punished. He should be surrendered by the authorities in whose jurisdiction he has sought refuge to the demanding State for trial. It would be a monstrous doctrine that would make New York State an inviolable sanctuary for criminals who perpetrate their offences by false tokens, fraudulent paper or representations communicated by mail or innocent agents. Such a decision would afford to "bunco men," "green-goods dealers" and commercial swindlers a haven of refuge within this State and would be a security to them in plying their games and frauds. Safe within this State they could plan and carry into effect their criminal purposes, plunder the merchants, banks and tradesmen of other States.

There is no place in the law of interstate rendition for the doctrine that actual presence in the demanding State at the

time of the commission of the offence charged shall be *conditio sine qua non*.  Frauds are attempted and committed by and through "endless chains of letters," advertisements of "get-rich-quick" schemes, sure methods of stock trading, betting on horse races and like schemes.  "Community of interest" in trade and manufactures, with its attendant consolidation of interests widely scattered, opens a vast field for fraudulent operations.  Such consolidations permit of the incorporation of companies in different States, false credit ratings, the fraudulent use of commercial paper and an ample opportunity to commit larceny by means of unwary and innocent clerks and agents.  Is New York State to be made the haven of all those swindlers?

VIII.  One offending against the laws of the United States may be sent to any part of the country.  There is no reason why the court should be so tender of the feelings of the criminal.  So far as offences against the laws of the United States are concerned, a man may be transported from Maine to California, or from Oregon to Florida and tried for crimes committed, even though he was the width of the continent from the scene of the crime at the time of its commission.  Sec. 731 Rev. Stat. U. S.; *Horner* v. *United States*, 143 U. S. 207; *In re Palliser*, 136 U. S. 257.

Reference was made in argument to the question, often disputed, where an indictment for murder shall be tried, when a person mortally wounded in one jurisdiction afterwards dies in another jurisdiction?  *Commonwealth* v. *Macloon*, 101 Massachusetts, 1, and authorities there cited; *The Queen* v. *Keyn*, 2 Ex. D. 63 ; 11 Am. Law Review, 615 ; *State* v. *Bowen*, 16 Kansas, 475 ; *United States* v. *Guiteau*, 1 Mackey, 498.  But there the original unlawful act is not only done by the offender, but reaches the person at whom it is aimed, in one jurisdiction, and it is the subsequent effect only which takes place in another jurisdiction.  We have no occasion now to consider such a case beyond observing that before the Declaration of Independence provision had been made by statute, both in England and Ireland, for trying such cases in either jurisdiction, and was never supposed to be inconsistent in principle with the

provision of Magna Charta (c. 14), for trial by a jury of the vicinage. (1 East P. C. 366; 1 Gabbett's Crim. Law, 501.) It is universally admitted that when a shot fired in one jurisdiction strikes a person in another jurisdiction, the offender may be tried where the shot takes effect, and the only doubt is whether he can be tried where the shot is fired. *Rex* v. *Coombes,* 1 Leach (4th ed.) 388; *United States* v. *Davis,* 2 Sumner, 482; *People* v. *Adams,* 3 Denio, 190, 207, and 1 N. Y. 173, 176, 179; *The Queen* v. *Keyn,* 2 Ex. D. 233, 234; Rev. Stat. sec. 731.

When an offence is committed by means of a communication through the post office, the sender has sometimes, as appears by the cases cited for the petitioner, been held to be punishable at the place where he mails the letter. *United States* v. *Worrall,* 2 Dall. 384; *United States* v. *Bickford,* 4 Blatchford, 337; *Rex* v. *Williams,* 2 Campbell, 506; *The King* v. *Burdett,* 3 B. & Ald. 717, and 4 B. & Ald. 95; *Perkin's Case,* 2 Lewin, 150; *Regina* v. *Cooke,* 1 Fost. & Finl. 64; *The Queen* v. *Holmes,* 12 Q. B. D. 23; *S. C.,* 15 Cox Crim. Cas. 343. But it does not follow that he is not punishable at the place where the letter is received by the person to whom it is addressed; and it is settled by an overwhelming weight of authority that he may be tried and punished at that place, whether the unlawfulness of the communication through the post office consists in its being a threatening letter, *The King* v. *Girdwood,* 1 Leach, 142; *S. C.,* 2 East P. C. 1120; *Esser's Case,* 2 East P. C. 1125; or a libel, *The King* v. *Johnson,* 7 East, 65; *S. C.,* 3 J. P. Smith, 94; *The King* v. *Burdett,* 4 B. & Ald. 95, 136, 150, 170, 184; *Commonwealth* v. *Blanding,* 3 Pick. 304; *In re Buell,* 3 Dillon, 116, 122; or a false pretense or fraudulent representation, *Regina* v. *Leech,* Dearsley, 642; *S. C.,* 7 Cox Crim. Cas. 100; *The Queen* v. *Rogers,* 3 Q. B. D. 28; *S. C.,* 14 Cox Crim. Cas. 22; *People* v. *Rathbun,* 21 Wend. 509; *People* v. *Adams,* 3 Denio, 190, and 1 N. Y. 173; *Foute* v. *State,* 15 Lea (Tenn.), 712; *In re Palliser,* 136 U. S. 265.

All throughout this country there are many cities, large and small, and villages on opposite sides of state boundaries, some separated by a river and others only by an imaginary boundary

line. A person may shoot and maim or kill another across the line, or hurl a lighted missile across the boundary and commit arson, send an innocent messenger and commit larceny by pretenses, or commit larceny by the use of the telephone or telegraph or mail, and be absolutely exempt from the trial and punishment in the State wherein the crime was committed, when, if the same person, by the same means, offended against the laws of the United States, he could be surrendered and sent into the other State or district for trial and punishment. Can it be possible that an invisible line of demarcation shall be regarded as an unsurmountable barrier against the just demands of the neighboring State, so far as crimes against the laws of the State are concerned, when, as to offences against the United States, the width of the continent is no protection?

IX. Tennessee is the State having jurisdiction of the crime. The crime charged in the indictments herein was the crime of grand larceny and false pretenses. The defendant in error could have "committed the crime within the State" of Tennessee, although never physically present within the State. *Adams* v. *People*, 1 N. Y. 173; *State* v. *Grady*, 34 Connecticut, 118; *Commonwealth* v. *White*, 123 Massachusetts, 430; *Commonwealth* v. *Smith*, 93 Massachusetts, 243; *Lindsey* v. *Smith*, 38 Ohio St. 507; *United States* v. *Davis*, 2 Sumner, 482; *Regina* v. *Barrett*, 22 Eng. Law & Eq. 611; *Regina* v. *Brisac*, 4 East, 164; *State* v. *Chapin*, 17 Arkansas, 565; *State* v. *Morrow*, 40 S. C. 211; *Noyes* v. *State*, 41 N. J. L. 418; *Simpson* v. *State*, 92 Georgia, 41; *Hatfield* v. *Commonwealth*, 12 S. W. Rep. 309.

"When the commission of an offence commenced without this State is consummated within its boundaries, the person committing the offence is liable to punishment therefor in this State, although he was out of the State at the commission of the offence charged; if he consummated it in this State through the intervention of an innocent or guilty agent, or by any other means proceeding directly from himself, and in such a case the jurisdiction is in the county in which the offence was consummated, unless otherwise provided by law." Sec. 5801, M. & V. Code, Tennessee.

X. The plaintiff in error returned only paper he had. There

seems to be some criticism in the opinion of the court below of the plaintiff in error for the failure to return all the papers that were used before the governor, but the plaintiff in error should not be criticised for this, nor should any unfavorable presumption be indulged in as against him, for the reason that it is the invariable rule of the executive of the State of New York to refuse to return any paper in an extradition case other than the warrant, and this rule is based upon the opinion prevailing in the executive department that the courts of the State have no jurisdiction to review the governor's action. Larceny is a crime and the merits cannot be tried in *habeas corpus.*

It is said that it is hard to send a man from his home and friends to a distant jurisdiction for trial, but there is no real hardship in this. When a man commits a crime within another jurisdiction he thereby selects the jurisdiction wherein the trial shall be had, and there is no burden imposed when the courts compel him to abide by his own selection. It would be a greater hardship to require prosecuting authorities to go to the distant place of his home and appear, first, before a committing magistrate, second, before a grand jury, and lastly, in a trial court, and to bring on these three occasions all the witnesses and documents.

*Mr. William S. Bryan, Jr.,* with whom *Mr. A. de R. Sappington* was on the brief, for defendant in error.

I. Whether the decision of the governor of the asylum State shall be final on the question as to whether the person sought to be extradited was in fact a fugitive from the justice of the demanding State, is a question proper to be determined by the courts of that State. *Cook* v. *Hart*, 146 U. S. 193. That in New York such inquiry is open to the courts of that State on *habeas corpus*, appears from the decision below in the case at bar.

Judge O'Brien in his opinion said: " The warrant did not conclusively establish the facts recited. It was so held by this court, *People ex rel. Lawrence* v. *Brady*, 56 N. Y. 182, and the law as laid down in that case has never been modified but has been repeatedly approved. Indeed I do not understand that

there is now any difference of opinion as to the legal effect of the warrant as evidence. It raised a presumption, but nothing more."

The view of the Court of Appeals of New York that the recitals in the warrant of the governor are only *prima facie* and are liable to be rebutted by proof on *habeas corpus* is the prevailing view. *Ex parte Todd*, 47 L. R. A. 566; *Matter of Cook*, 49 Fed. Rep. 823; *Ex parte Hart*, 63 Fed. Rep. 260; *Work* v. *Conington*, 34 Ohio St. 64; *Matter of Manchester*, 5 California, 237; 15 Am. & Eng. Ency. of Law (2d ed.), 205.

Whether the accused is a fugitive from justice is a question of fact. *Roberts* v. *Reilly*, 116 U. S. 80.

We have just seen that this question of fact was decided by the court below against the plaintiff in error, and that that finding is not reviewable by this court.

II. If the facts were open for review, there was obviously no error in the conclusion reached by the court below. But the finding of that court on the facts is not open for review in this proceeding. Nothing is open for review on this writ of error, but such rulings in law as erroneously decide some Federal question against the plaintiff in error.

It is well settled that on a writ of error, this court will confine itself to an examination of such of the questions of law decided by the court below as are properly reviewable here, and that it cannot, and will not, review the findings of that court on questions of fact. *In re Neagle*, 135 U. S. 42; *Gardner* v. *Bonestell*, 180 U. S. 370; *Dower* v. *Richards*, 151 U. S. 658; *In re Buchanan*, 158 U. S. 36; *Hedrick* v. *Atchison, Topeka etc. R. R.*, 167 U. S. 677; *Turner* v. *N. Y.*, 168 U. S. 95; *West. Union Tel. Co.* v. *Call Pub. Co.*, 181 U. S. 103; *Egan* v. *Hart*, 165 U. S. 189; *Chicago, Burlington etc. Rd.* v. *Chicago*, 166 U. S. 246.

It cannot be denied that this court has the power to examine the opinions in the court below to ascertain the grounds of that court's decision. *Kreiger* v. *Shelly R. R.*, 125 U. S. 44; *Dibble* v. *Bellingham Co.*, 163 U. S. 69. It cannot be contended successfully that the decision below was against the validity of the authority and power exercised under the Constitution of

the United States and under section 5278 of the Revised Statutes. *Cook County* v. *Calumet etc. Canal*, 138 U. S. 653; *Balto. & Pot. R. R.* v. *Hopkins*, 130 U. S. 224; *Brooks* v. *Missouri*, 124 U. S. 394.

Stated shortly, the case is this:

(*a*) The legality of Corkran's detention under the governor's warrant of extradition was a question into which the state and Federal courts in New York had concurrent jurisdiction to enquire. *Robb* v. *Connolly*, 111 U. S. 639.

(*b*) The state court in the exercise of this rightful jurisdiction decided the question of fact, *i. e.*, that Corkran was not a fugitive from justice, against the plaintiff in error. This decision, as already stated, did not in any way impugn the statute nor any right conferred by it, and the writ of error should be dismissed for want of jurisdiction.

III. There was no authority in the governor of New York to order the extradition of Corkran for trial for an offence claimed to have been committed when he was not corporeally present in the State of Tennessee.

The Constitution of the United States (Art. 4, sec. 2, subd. 2,) reads: " A person charged in any State with treason, felony, or other crime, *who shall flee from justice*, and be found in another State, shall, on demand of the executive authority of the State *from which he fled*, be delivered up, to be removed to the State having jurisdiction of the crime."

Flight—being a fugitive from justice—is the jurisdictional fact. In speaking of the necessity for an actual flight or *departure* from the demanding State of the accused before he can be said to be a fugitive-from justice, Judge Seevers in delivering the opinion of the court in *Jones* v. *Leonard*, 50 Iowa, 108, said: " It is difficult to see how one can flee who stands still. That there must be *an actual fleeing* we think is clearly recognized by the Constitution of the United States. The words, ' who shall flee ' do not include a person who never was in the country from which he is said to have fled."

A great cloud of state decisions enforce the construction of the Constitution that the accused must have been physically present in the demanding State at the time when the assumed

crime is alleged to have been committed. *Wilcox* v. *Nolze*, 34 Ohio St. 520; *In re Manchester*, 5 California, 237; *Jones* v. *Leonard*, 50 Iowa, 106; *In re Tod*, 12 South Dakota, 386; *In re Mohr*, 73 Alabama, 503, 514; *In re Fetter*, 23 N. J. L. 311; *In re Voorhees*, 32 N. J. L. 150; *Hartman* v. *Aveline*, 63 Indiana, 345; *Ex parte Knowles*, 16 Ky. L. Rep. 263; *In re Greenough*, 31 Vermont, 279; *Kingsbury's Case*, 106 Massachusetts, 223; *Re Heyward*, 1 Sandf. 701; *State* v. *Hall*, 115 N. C. 811.

The same interpretation of the constitutional provision was followed by the governor of Illinois in the attempt to extradite Mr. Storey, editor of the Chicago Tribune into Wisconsin (3 Central Law Journal, 636); and by the governor of Maryland in the case of Max Juhn, attempted to be extradited into New York (2 Moore on Extradition, sec. 585); and by the governor of New York in the case of Mitchell, attempted to be extradited into New Jersey (4 New York Crim. Rep. 596).

The law is declared in the leading text books to the same effect. 2 Moore on Extradition, sec. 581; Spear on Extradition, pages 397, 499; 7 Am. & Eng. Ency. of Law (1st ed.), 646 and note 1; 12 Am. & Eng. Ency. of Law (2d ed.), 603 and note 3.

And the same rule, that there must have been an actual presence in and departure from the demanding State is adopted in the Federal courts. *In re Samuel Jackson*, 2 Flipp. 183, 186; *S. C.*, Fed. Cas. No. 7125; *Ex parte Jos. Smith*, 3 McLean, 121; *S. C.*, Fed. Cas. No. 12,968; *Ex parte McKean*, 3 Hughes, 25; *United States* v. *Fowkes*, 49 Fed. Rep. 52; *Tennessee* v. *Jackson*, 36 Fed. Rep. 258; *In re White*, 55 Fed. Rep. 54; *S. C.*, 5 C. C. A. 29; *Ex parte Reggel*, 114 U. S. 651; *Roberts* v. *Reilly*, 116 U. S. 97., *Regina* v. *Jacobi*, 46 L. T. N. S. 595, and *Regina* v. *Nillens*, 53 L. S. Mag. Prob. Div. & Adm. 158, distinguished as the English decisions on international extradition where persons have been surrendered who were charged with the crime of obtaining money under false pretenses by letters written from beyond the jurisdiction of the demanding country, have no bearing on the question of the right to an interstate extradition in this country under the Constitution and act of Congress, because the language of the English Extradition Act,

33 Victoria, chapter 52, is very different from the language of the Constitution and of the act of Congress.

Nor are cases in the courts of this country on international extradition precedents in point. Whether a person apprehended in this country and sought to be extradited to some foreign country shall be delivered up depends, of course, upon the terms of the treaty with that country which are seldom, if ever, in the language of the Constitution providing for interstate extradition.

The doctrine that there can be a constructive presence in a State and a constructive flight therefrom has no more foundation in law, than has the theory that there is any charge of a crime committed by the defendant when not physically and actually present in the State of Tennessee, any foundation in the facts of this case, as disclosed by the record. Both are mere presumptions, without anything to support them.

As to the point that public policy required that there should be some means of arresting persons in one State charged with having by the use of the mail or the telegraph obtained fraudulently money, goods or credits from persons in another State, it is respectfully suggested that the question is not one of public policy, but of power under the Constitution and act of Congress.

This must, of course, be ascertained by turning to the words of the Constitution and of the act of Congress, and ascertaining what they meant; not what we may now consider they ought to have meant. *United States* v. *Chase*, 135 U. S. 262; *Jones* v. *Smart*, 1 T. R. 51; *The Queensborough Cases*, 1 Bligh, 497.

If, however, the question of supposed public policy were entitled to any weight in discussing a question of the meaning of a clause in the Constitution affecting the liberty and safety of the citizen, it might be urged that the collection of civil debts by a threat of criminal prosecution, is a practice not infrequently indulged by attorneys of the baser sort, and by business men of not very high principle, and that any rule which rendered possible the transportation of persons for trial to a distant portion of the Union, whenever there is a business dis-

pute as to the truth of a warranty or representation made in correspondence, would vastly encourage this species of blackmail. That compounding a felony is a crime, seems to be an obsolete rule of law, in certain enterprising commercial centers. *Tennessee* v. *Jackson*, 36 Fed. Rep. 260.

This is a most remarkable case. The warrant nowhere states that the governor of New York *found as a fact* that the defendant was a fugitive from justice; nor that any *sworn evidence* of that fact was submitted to him; nor that he had any definite or satisfactory evidence on this subject of any sort before him. All that a fair reading of the warrant discloses on the subject of any flight from justice by defendant is that the governor of Tennessee "represents" him to be a fugitive and that copies of an indictment "and other documents" "charge" him with being such a fugitive. A governor of a State causes the arrest of a man upon a warrant, which does not charge that the fact exists which would make him liable to arrest, *i. e.*, that he is a fugitive from justice. In the course of the proceedings this fact is nowhere even indicated, and the court competent to decide the question finds that it is disproved. Yet the record is brought to this court.

This writ of error should be dismissed for want of jurisdiction; and that failing this, the judgment should be affirmed on the merits.

Mr. Justice Peckham, after making the foregoing statement of facts, delivered the opinion of the court.

By clause 2 of section 2 of Article IV of the Constitution of the United States it is provided:

"A person charged in any State with treason, felony, or other crime, who shall flee from justice, and be found in another State, shall on demand of the executive authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the crime."

It was held in *Commonwealth of Kentucky* v. *Dennison, Governor*, 24 How. 66, 104, that this provision of the Constitution was not self-executing, and that it required the action of

Congress in that regard. Congress did act by passing the statute, approved February 12, 1793. 1 Stat. 302. The substance of that act is reproduced in section 5278 of the Revised Statutes, as follows :

"SEC. 5278. Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, it shall be the duty of the executive authority of the State or Territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the State or Territory making such demand shall be paid by such State or Territory."

The proceedings in this case were under this section, and the warrant issued by the governor was sufficient *prima facie* to justify the arrest of the relator and his delivery to the agent of the State of Tennessee. Certain facts, however, must appear before the governor has the right to issue his warrant. As was said in *Roberts* v. *Reilly*, 116 U. S. 80, 95, it must appear to the governor, before he can lawfully comply with the demand for extradition, that the person demanded is substantially charged with a crime against the laws of the State from whose justice he is alleged to have fled, by an indictment or an affidavit, etc., and that the person demanded is a fugitive from the justice of the State the executive authority of which makes the demand. It was also stated in the same case that the question whether the person demanded was substantially charged

with a crime or not was a question of law and open upon the face of the papers to judicial inquiry upon application for a discharge under the writ of *habeas corpus ;* that the question whether the person demanded was a fugitive from the justice of the State was a question of fact which the governor upon whom the demand was made must decide upon such evidence as he might deem satisfactory. How far his decision might be reviewed judicially in proceedings in *habeas corpus,* or whether it was conclusive or not, were, as stated, questions not settled by harmonious judicial decisions nor by any authoritative judgment of this court, and the opinion continues as follows:

"It is conceded that the determination of the fact by the executive of the State in issuing his warrant of arrest, upon a demand made upon that ground, whether the writ contains a recital of an express finding to that effect or not, must be regarded as sufficient to justify the removal until the presumption in its favor is overthrown by contrary proof."

In *People* v. *Brady,* 56 N. Y. 182, it was held that the courts have jurisdiction to interfere by writ of *habeas corpus* and to examine the grounds upon which an executive warrant for the apprehension of an alleged fugitive from justice from another State is issued, and in case the papers are defective and insufficient, to discharge the prisoner.

In the case before us the New York Court of Appeals held that if upon the return to the writ of *habeas corpus* it is clearly shown that the relator is not a fugitive from justice, and there is no evidence from which a contrary view can be entertained, the court will discharge the person from imprisonment, but that mere evidence of an alibi, or evidence that the person demanded was not in the State as alleged, would not justify his discharge, where there was some evidence on the other side, as *habeas corpus* was not the proper proceeding to try the question of the guilt or innocence of the accused. And the court also held that the conceded facts showed the absence of the accused at the time when the crimes, if ever, were committed, and that the demand was in truth based upon the doctrine that a constructive presence of the accused in the demanding State

at the time of the alleged commission of the crime was sufficient to authorize the demand for his surrender.

We are of opinion that the warrant of the governor is but *prima facie* sufficient to hold the accused, and that it is open to him to show by admissions, such as are herein produced, or by other conclusive evidence, that the charge upon which extradition is demanded assumes the absence of the accused person from the State at the time the crime was, if ever, committed. This is in accordance with the authorities in the States, cited in the opinion of Judge Cullen in the New York Court of Appeals, and is, as we think, founded upon correct principles. *Robb* v. *Connolly*, 111 U. S. 624, recognizing authority of States to act by *habeas corpus* in extradition proceedings.

If upon a question of fact made before the governor, which he ought to decide, there were evidence *pro* and *con* the courts might not be justified in reviewing the decison of the governor upon such question. In a case like that, where there was some evidence sustaining the finding, the courts might regard the decision of the governor as conclusive. But here as we have the testimony of the relator (uncontradicted) and the stipulation of counsel as to what the facts were, we have the right and it is our duty on such proof and concession to say whether a case was made out within the Federal statute justifying the action of the governor. It is upon the statute that the inquiry must rest.

In the case before us it is conceded that the relator was not in the State at the various times when it is alleged in the indictments the crimes were committed, nor until eight days after the time when the last one is alleged to have been committed. That the prosecution on the trial of such an indictment need not prove with exactness the commission of the crime at the very time alleged in the indictment is immaterial. The indictments in this case named certain dates as the times when the crimes were committed, and where in a proceeding like this there is no proof or offer of proof to show that the crimes were in truth committed on some other day than those named in the indictments, and that the dates therein named were erroneously stated, it is sufficient for the party charged to show that he was not in the

State at the times named in the indictments, and when those facts are proved so that there is no dispute in regard to them, and there is no claim of any error in the dates named in the indictments, the facts so proved are sufficient to show that the person was not in the State when the crimes were, if ever, committed.

The New York Court of Appeals has construed the stipulation as conceding these facts, and we think that its construction of the stipulation is the correct one.

It is, however, contended that a person may be guilty of a larceny or false pretense within a State without being personally present in the State at the time, therefore the indictments found were sufficient justification for the requisition and for the action of the governor of New York thereon. This raises the question whether the relator could have been a fugitive from justice when it is conceded he was not in the State of Tennessee at the time of the commission of those acts for which he had been indicted, assuming that he committed them outside of the State.

The exercise of jurisdiction by a State to make an act committed outside its borders a crime against the State is one thing, but to assert that the party committing such act comes under the Federal statute, and is to be delivered up as a fugitive from the justice of that State, is quite a different proposition.

The language of section 5278, Rev. Stat., provides, as we think, that the act shall have been committed by an individual who was at the time of its commission personally present within the State which demands his surrender. It speaks of a demand by the executive authority of a State for the surrender of a person as a fugitive from justice, by the executive authority of a State *to which such person has fled*, and it provides that a copy of the indictment found, or affidavit made before a magistrate of any State, charging the person demanded with having committed treason, etc., certified as authentic by the governor or chief magistrate of the State or Territory *from whence the person so charged has fled*, shall be produced, and it makes it the duty of the executive authority of the State *to which such person has fled* to cause him to be arrested and se-

cured. Thus the person who is sought must be one who has fled from the demanding State, and he must have fled (not necessarily directly) to the State where he is found. It is difficult to see how a person can be said to have fled from the State in which he is charged to have committed some act amounting to a crime against that State, when in fact he was not within the State at the time the act is said to have been committed. How can a person flee from a place that he was not in ? He could avoid a place that he had not been in ; he could omit to go to it; but how can it be said with accuracy that he has fled from a place in which he had not been present ? This is neither a narrow nor, as we think, an incorrect interpretation of the statute. It has been in existence since 1793, and we have found no case decided by this court wherein it has been held that the statute covered a case where the party was not in the State at the time when the act is alleged to have been committed. We think the plain meaning of the act requires such presence, and that it was not intended to include, as a fugitive from the justice of a State, one who had not been in the State at the time when, if ever, the offence was committed, and who had not, therefore in fact, fled therefrom.

In *Ex parte Reggel*, 114 U. S. 642, 651, it was stated by Mr. Justice Harlan, in speaking for the court :

"The only question remaining to be considered, relates to the alleged want of competent evidence before the governor of Utah, at the time he issued the warrant of arrest, to prove that the appellant was a fugitive from the justice of Pennsylvania. Undoubtedly, the act of Congress did not impose upon the executive authority of the Territory the duty of surrendering the appellant, unless it was made to appear, in some proper way, that he was a fugitive from justice. In other words, the appellant was entitled, under the act of Congress, to insist upon proof that he was within the demanding State at the time he is alleged to have committed the crime charged, and subsequently withdrew from her jurisdiction, so that he could not be reached by her criminal process. The statute, it is to be observed, does not prescribe the character of such proof; but that the executive authority of the Territory was not required,

by the act of Congress, to cause the arrest of appellant, and his delivery to the agent appointed by the governor of Pennsylvania, without proof of the fact that he was a fugitive from justice, is, in our judgment, clear from the language of that act. Any other interpretation would lead to the conclusion that the mere requisition by the executive of the demanding State, accompanied by the copy of an indictment, or an affidavit before a magistrate, certified by him to be authentic, charging the accused with crime committed within her limits, imposes upon the executive of the State or Territory where the accused is found, the duty of surrendering him, although he may be satisfied, from incontestible proof, that the accused had, in fact, never been in the demanding State, and, therefore, could not be said to have fled from its justice. Upon the executive of the State in which the accused is found rests the responsibility of determining, in some legal mode, whether he is a fugitive from the justice of the demanding State. He does not fail in duty if he makes it a condition precedent to the surrender of the accused that it be shown to him, by competent proof, that the accused is, in fact, a fugitive from the justice of the demanding State."

To the same effect is *Roberts* v. *Reilly*, 116 U. S. 80, *supra*. In that case the issue was made about the presence of the party in the demanding State at the time the act was alleged to have been committed, and there was direct and positive proof before the governor of Georgia, upon whom the demand had been made, and there was no other evidence in the record which contradicted it. It was said (p. 97):

"The appellant in his affidavit does not deny that he was in the State of New York about the date of the day laid in the indictment when the offence is alleged to have been committed, and states, by way of inference, only, that he was not in that State on that very day; and the fact that he has not been within the State since the finding of the indictment is irrelevant and immaterial."

It is clear that it was regarded by the court as essential that the person should have been in the State which demanded his surrender at the time of the commission of the offence alleged

in the affidavit or indictment, and that it was a fact jurisdictional in its nature, without which he could not be proceeded against under the Federal statute.

*Cook* v. *Hart*, 146 U. S. 183, decides nothing to the contrary. In that case the party was arrested in Illinois on account of a crime which, it was alleged, had been committed by him in Wisconsin. He sued out a writ of *habeas corpus* in Illinois to test the legality of his arrest under the circumstances appearing in the case. Upon the hearing the court decided the arrest to be legal, and the party arrested acquiesced in this disposition of the case and made no attempt to obtain a review of the judgment in a superior court. It was not until after his arrival in Wisconsin, whither he was taken by virtue of the warrant issued by the governor of Illinois, and after his trial had begun in Wisconsin, that he made application to the Circuit Court of the United States in Wisconsin to be released upon *habeas corpus,* upon the ground he had originally urged, that he was not a fugitive from justice within the meaning of the Constitution and laws of the United States. That court decided against him, holding that he had been properly surrendered. This court said that, assuming that the question might be jurisdictional when raised before the executive or the courts of the surrendering State, that it was presented in a somewhat different aspect after the person had been delivered to the agent of the demanding State, and had actually entered the territory of that State and was held under the process of its courts. And it was said that the authorities tended to support the theory that the executive warrant has spent its force when the accused has been delivered to the demanding State; that it is too late for him to object even to jurisdictional defects in his surrender, and that he was rightfully held under the process of the demanding State. Whether the claim made by the party brought to Wisconsin that he was illegally arrested in Illinois was well founded or not, this court did not feel called upon to consider, or to review the propriety of the decision of the court below, and this on the ground that it was proper to await until the state court had finally acted upon the case, and then to require the accused to sue out his writ of error from this court to

the highest state court, where a decision could be had, instead of determining the question summarily on *habeas corpus.*

It is contended, however, that there are cases in this court which sustain the proposition maintained by the plaintiff in error herein, and *Kentucky* v. *Dennison,* 24 How. 66, *supra,* is referred to as authority. It is therein held that the words " treason, felony, or other crime," spoken of in the Constitution, included every offence forbidden and made punishable by the laws of the State where the offence is committed, and it is therefore argued that as an act committed outside its borders may, under certain circumstances, become a crime against the State, a person thus committing such an act comes within the meaning of the Constitution, and should be surrendered upon demand of the governor of the State whose law he is alleged to have violated.

On looking at that case it is seen that the facts were wholly different, and the court had no such case as the one before us in mind. The party against whom the demand was made had committed the crime, as alleged, within the State of Kentucky, and no question arose as to his liability to be returned to Kentucky for any act done by him outside its borders. The governor of Ohio, upon whom the demand was made, acting under the advice of his attorney general, refused to surrender the fugitive because the crime alleged was neither treason nor felony at common law, nor was it one which was regarded as a crime by the usages and laws of civilized nations, and the governor was advised that obviously a line must be somewhere drawn distinguishing offences which did, from offences which did not, fall within the scope of the power granted by the Constitution. It was in regard to this contention that this court held as stated. Mr. Chief Justice Taney, delivering the opinion of the court said (page 99):

"The words, 'treason, felony, or other crime,' in their plain and obvious import, as well as in their legal and technical sense, embrace every act forbidden and made punishable by a law of the State. The word 'crime' of itself includes every offence, from the highest to the lowest in the grade of offences, and includes what are called 'misdemeanors,' as well as treason and

felony.   4 Bl. Com. 5, 6, and note 3, Wendall's edition.   But as the word 'crime' would have included treason and felony, without specially mentioning those offences, it seems to be supposed that the natural and legal import of the word, by associating it with those offences, must be restricted and confined to offences already known to the common law and to the usage of the nations, and regarded as offences in every civilized community, and that they do not extend to acts made offences by local statutes growing out of local circumstances, nor to offences against ordinary police regulations.   This is one of the grounds upon which the governor of Ohio refused to deliver Lago, under the advice of the attorney general of that State.

" But this inference is founded upon an obvious mistake as to the purposes for which the words ' treason and felony' were introduced.   They were introduced for the purpose of guarding against any restriction of the word ' crime,' and to prevent this provision from being construed by the rules and usages of independent nations in compacts for delivering up fugitives from justice.

\*     \*     \*     \*     \*     \*     \*     \*

" This compact engrafted in the Constitution included, and was intended to include, every offence made punishable by the law of the State in which it was committed, and that it gives the right to the executive authority of the State to demand the fugitive of the executive authority of the State in which he is found; that the right given to ' demand' implies that it is an absolute right; and it follows that there must be a correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy or laws of the State to which the fugitive has fled."

The court, however, held that while it was the duty of the executive authority of Ohio under the circumstances to deliver the person demanded, and that such duty was merely ministerial and the governor had no right to exercise any discretionary power as to the nature or character of the crime charged in the indictment, yet it was also held that the Federal courts had no means to compel the governor to perform the moral obligation of the State under the compact in the Constitution,

and that the courts could not coerce the state executive or other state officer as such to perform any duty by act of Congress. On that ground the motion for a mandamus to compel the governor of Ohio to issue his warrant was refused. Nothing in that case can be regarded as any authority for the proposition contended for here. The case assumed the presence of the party in the State at the time of the alleged commission of the crime. The question was whether upon such assumption the executive of the State upon whom the demand was made could examine as to the character of the crime and refuse to deliver up, in his discretion.

To the same effect is *Ex parte Reggel*, 114 U. S. 642, *supra*. In that case the objection was made in the court of original jurisdiction that there could be no valid requisition based upon an indictment for an offence less than a felony. It was held that such view was erroneous, and *Kentucky* v. *Dennison, supra*, was cited in support of that proposition, yet it was in this very case of *Reggel* that the remarks already quoted were made, that the person demanded was entitled to insist upon proof that he was within the demanding State at the time that he is charged to have committed the crime, and subsequently withdrew therefrom to another jurisdiction, so that he could not be reached by the criminal process of the State where the act was committed.

Many state courts before whom the question has come have held that a merely constructive presence in the demanding State at the time of the alleged commission of the offence was not sufficient to render the person a fugitive from justice; that he must have been personally present within the State at the time of the alleged commission of the act, or else he could not be regarded as a fugitive from justice. Spear and also Moore on Extradition are to the same effect. Those authorities and text writers are referred to in the margin.[1]

---

[1] *Wilcox* v. *Nolze*, (1878) 34 Ohio St. 520, 524; *Jones* v. *Leonard*, (1878) 50 Iowa, 106; *In re Mohr*, (1883) 73 Alabama, 503, 514; *In re Fetter*, (1852) 23 N. J. L. 311; *Hartman* v. *Aveline*, (1878) 63 Indiana, 344; *Ex parte Knowles*, (1894) 16 Ky. Law Rep. 263; *Kingsbury's Case*, (1870) 106 Massachusetts, 223, 227; *State* v. *Hall*, (1894) 115 N. C. 811; 2 Moore on Extradition, secs. 579, 581, 584; Spear on Extradition, 310 *et seq.* ; Cooley's Const. Lim. 4th ed. 21, note 1; 3 Crim. Law Rep. 806 *et seq.* published, 1882.

In the case of *In re White*, 55 Fed. Rep. 54, 58, in the United States Circuit Court of Appeals for the Second Circuit, it was said by Lacombe, circuit judge, that it was proper to inquire upon *habeas corpus* whether the prisoner was in fact within the demanding State when the alleged crime was committed, for if he were not it could not be properly held that he had fled from it.

The subsequent presence for one day (under the circumstances stated above) of the relator in the State of Tennessee, eight days after the alleged commission of the act, did not, when he left the State, render him a fugitive from justice within the meaning of the statute. There is no evidence or claim that he then committed any act which brought him within the criminal law of the State of Tennessee, or that he was indicted for any act then committed. The proof is uncontradicted that he went there on business, transacted it and came away. The complaint was not made nor the indictments found until months after that time. His departure from the State after the conclusion of his business cannot be regarded as a fleeing from justice within the meaning of the statute. He must have been there when the crime was committed, as alleged, and if not, a subsequent going there and coming away is not a flight.

We are of opinion that as the relator showed without contradiction and upon conceded facts that he was not within the State of Tennessee at the times stated in the indictments found in the Tennessee court, nor at any time when the acts were, if ever committed, he was not a fugitive from justice within the meaning of the Federal statute upon that subject, and upon these facts the warrant of the governor of the State of New York was improperly issued, and the judgment of the Court of Appeals of the State of New York discharging the relator from imprisonment by reason of such warrant must be

*Affirmed.*